1
2
3
4
5                         UNITED STATES DISTRICT COURT
6                        NORTHERN DISTRICT OF CALIFORNIA
7
8
9
10
11   PAULA BROWN,
12            Plaintiff,                        No. C 13-5497 PJH
13       v.                                     **ORDER DENYING PLAINTIFF'S
                                                RULE 52 MOTION FOR JUDGMENT,**
14   CONNECTICUT GENERAL LIFE                   **AND GRANTING DEFENDANT'S MOTION**
     INSURANCE COMPANY,
15            Defendant.
16   _____/
17       The parties' cross-motions for judgment under Federal Rule of Civil Procedure 52
18   came on for hearing on October 29, 2014.  Plaintiff appeared by her counsel Ryan
19   Opgenorth, and defendant appeared by its counsel Adrienne Publicover.  Having read the
20   papers submitted by the parties and carefully considered their arguments and the relevant
21   legal authority, the court hereby DENIES plaintiff's motion and GRANTS defendant's
22   motion.
23                              **FACTUAL BACKGROUND**
24       Plaintiff Paula Brown seeks reinstatement of a "waiver of premium" benefit under
25   group life insurance coverage offered by her former employer, Life Insurance Company of
26   America ("LINA"), a subsidiary of defendant Connecticut General Life Insurance Company
27   ("CGLIC").  The policy and this action are governed by the Employment Retirement Income
28   Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq.

*United States District Court*
*For the Northern District of California*

Plaintiff was employed by LINA for 24 years, initially working as a claims adjuster, and later as a Senior Account Executive.  She received several awards and commendations, and was ranked #1 in insurance sales for many years.  As an employment benefit, LINA provided plaintiff with self-insured short-term disability ("STD") coverage, long-term disability ("LTD") coverage, and life insurance coverage.

The LTD Policy contained an 18-month "own occupation" definition of disability, followed by an "any occupation" definition.  It also contained a 24-month limitation on payment of benefits for disability caused by certain enumerated conditions, including depressive disorders and mental illness ("the Mental Illness provision").

Plaintiff's life insurance coverage, which is at issue in this action, is under CGLIC group life insurance policy number GUM 102600, certificate number 2024602 ("the Life Policy").  Administrative Record ("AR") 416-417, 442.  The insurer and underwriter of the Life Policy is CGLIC.  Plaintiff elected $342,000 in coverage under the Life Policy, although by the time she ceased working because of her disability, the death benefit had increased to $594,000.

Plaintiff has always been required to pay premiums for this coverage, because it is optional under the employee benefit plan.  Those premiums are waived if the beneficiary becomes "Totally Disabled," as defined in the Life Policy, before age 60, as long as she provides continuing proof that she is Totally Disabled (defined as "completely unable to engage in any occupation for wage or profit because of injury or sickness").  AR 475-476.

The Life Policy provides that "[s]uch proof of Total Disability must be submitted to the Insured Company no later than one year from the date the . . . Insured becomes Totally Disabled."  AR 475.  Once the premium has been waived for one year, it will be waived for further periods of one year if the insured "remains continuously Totally Disabled" and "submits to [CGLIC] during the three months before the end of each such one-year period, proof of the continuation of Total Disability."  AR 475; see also AR 787.

In the fall of 2000, plaintiff began suffering from a number of conditions, ultimately including symptoms of major depressive disorder, hypertension, chronic pain, severe

1  headaches, lightheadedness, dizziness, chronic fatigue, insomnia, anhedonia, anergy, and
2  suicidal ideation, along with psychomotor retardation, memory problems, and concentration
3  difficulties.

4      In November 2000, plaintiff submitted a claim for STD benefits, which was initially
5  denied on the basis that plaintiff's doctors had not provided any "objective medical
6  evidence" to substantiate her disability.  AR 343.  After plaintiff appealed the decision, it
7  was overturned, based in part on the further submissions of her treating physicians – Dr.
8  Andrew Krompier and Dr. Bruce Robertson.  AR 310-313, 345.

9      CGLIC referred plaintiff for evaluation to a psychologist, Tatiana Novakovic-Agopian
10  Ph.D, who saw plaintiff on April 24 and May 1, 2001, and issued a report in early May
11  2001.  AR 247-254.  Dr. Novakovic-Agopian's diagnosis was Major Depressive Disorder,
12  severe, without psychotic features (296.23) and Cognitive Disorder NOS (294.9).  She also
13  noted that plaintiff had been diagnosed with hypertension, headaches, occupational and
14  health problems.  She recommended a head MRI or CT scan to further clarify plaintiff's
15  symptoms, and an evaluation for a different antidepressant medication or increased
16  dosage, and suggested plaintiff might benefit from more intensive psychotherapy
17  treatment.

18      In March 2001, plaintiff submitted a claim for LTD benefits.  See AR 348-349.  The
19  basis of her claim of total disability was that she suffered from mood and cognitive
20  disorders.  She claimed no physical limitations.  Her LTD claim was approved in May 2001.
21  On January 17, 2003, LINA wrote plaintiff a letter explaining that, because her primary
22  disability was caused by Major Depressive Disorder, the Mental Illness provision would
23  apply, and her benefits would end on May 22, 2003, unless she could show she was
24  unable to perform the duties of any occupation based on a physical condition.  AR 150.
25  Plaintiff's husband Larry Brown appealed the proposed termination of benefits on plaintiff's
26  behalf on February 10, 2003.  AR 148.

27      On May 2, 2003, while the LTD appeal was pending, plaintiff underwent a
28  neurological assessment with Michael Greicius, M.D., Clinical Instructor in the Department

3

**United States District Court**

For the Northern District of California

1   of Neurology and Neurological Sciences at Stanford University Medical Center.  The

2   assessment was performed at the request of plaintiff's internist, Dr. Robertson, and was not

3   ordered by LINA.  AR 67.  Dr. Greicius' May 2, 2003 report indicated that plaintiff appeared

4   depressed, but he also remarked on "several instances throughout the examination

5   suggestive of poor effort or a tendency to exaggerate difficulty with a certain task (such as

6   when trying to touch her finger to her nose with eyes closed and touching her forehead").

7   AR 68.  A brain MRI appeared to him to be normal.  AR 69.

8        On the same day, plaintiff participated in a formal neuropsychological assessment

9   conducted by Peter Karzmark, Ph.D., Clinical Assistant Professor of Neurology at Stanford.

10  Dr. Karzmark's May 16, 2003 report stated that a test for exaggeration of cognitive function

11  was administered in part because of suspicion of external motivation for claiming illness or

12  disability.  AR 892.  Because plaintiff performed at such a low level, Dr. Karzmark

13  concluded that the test results were "strongly suggestive" of exaggeration of her claimed

14  cognitive dysfunction.  AR 893.  He also found that her remaining formal assessment test

15  results were "strongly influenced by exaggeration and not to be indicative of her level of

16  cognitive functioning[,]" and that her claimed severe depression was unsupported by the

17  assessment, which revealed no more than "minimal depression."  AR 895.

18       In a letter dated June 16, 2003, LINA advised plaintiff that plaintiff's LTD claim was

19  being denied based on the Mental Illness limitation.  AR 52-55.  The letter stated that

20  plaintiff had provided LINA with a letter indicating that she was disabled due to a physical

21  condition, and that she had asked that LINA obtain additional medical information.  The

22  letter stated further that LINA had written to plaintiffs' medical providers (Drs. Robertson,

23  Krompier, and Greicius) asking specific questions and also requesting office notes.  AR 53-

24  54.

25       The letter stated that Dr. Krompier responded in February 2003, but failed to

26  complete the physical assessment form, and also did not provide office notes but instead

27  requested that LINA send "a copy service."  He provided a list of medications plaintiff was

28  taking.  AR 53.  Dr. Robertson also responded in February 2003, stating he was sending

United States District Court

For the Northern District of California

1    medical records (though none were enclosed) but that his office was not equipped to

2    perform a Physical Abilities Assessment.  Dr. Robertson finally provided office notes in April

3    2003, which did not show any physical disability.

4         In particular, the notes from January 18, 2002 and February 24, 2003 showed

5    plaintiff's hypertension was under control, and notes from September 2002 reflected a

6    normal EEG.  AR 53-54.  Dr. Greicius provided a report dated May 2, 2003, stating that on

7    examination, plaintiff provided poor effort with a tendency to exaggerate difficulty, and that

8    the MRI exam and neurological exam were both normal.  AR 54.  Dr. Krompier also had an

9    EEG and MRI performed, and both were negative for disability due to a physical condition.

10   AR 54.  Plaintiff did not file a further appeal.  Nor did she seek judicial review of the

11   decision.

12        In December 2006, plaintiff submitted a claim to CGLIC's life insurance claim

13   division for an LWOP under the group life insurance coverage.  AR 1055-1056.  CGLIC

14   requested that plaintiff complete a Waiver of Premium Proof of Loss Form and a Disability

15   Questionnaire and Disclosure Authorization (so that CGLIC could obtain necessary medical

16   evidence to support plaintiff's claim), and that she have her doctor complete an Attending

17   Physician Statement ("APS").  AR 1036-1037, 1056-1057.

18        In her January 7, 2007 Disability Questionnaire, plaintiff claimed "significant

19   deterioration of cognitive functioning and abilities" as well as "uncontrollable hypertension"

20   and migraine headaches.  She indicated she was able to shower and dress herself, and

21   drive, watch TV, and shop "minimally," but that she otherwise engaged in no activities other

22   than occasionally going boating with her husband on the weekends.  She asserted that her

23   "severe mental illnesses" would not allow her to work.  AR 1018.

24        In response to CGLIC's records request, plaintiff's therapist Noga Dreifuss, MFT,

25   submitted plaintiff's records and psychotherapy notes from June 2003 to January 2007.  Dr.

26   Robertson, plaintiff's internist, also provided all of his office visit notes.  Based on those

27   records, CGLIC approved plaintiff's LWOP claim on March 5, 2007, noting that the benefit

28   would continue for one-year periods "if we receive proof that total disability, as defined by

United States District Court
For the Northern District of California

1    your policy, continues." CGLIC added that "[w]e will contact you on an annual, or as

2    needed basis, to request a current statement of your continued disability.  Your life

3    insurance premiums will be waived as long as you remain continuously disabled."  AR 830,

4    833.

5         For the next four years, CGLIC continued the LWOP benefit based on

6    documentation and certifications provided annually by Dr. Robertson, plaintiff's internist,

7    AR 789-801, although both Dr. Robertson (AR 815) and plaintiff's husband Mr. Brown (AR

8    798-799) also questioned the necessity of providing annual certifications of continuing

9    disability.

10        In a May 12, 2011 letter to plaintiff again continuing her benefits (AR 787), CGLIC

11   Technical Specialist M. Scott Donelli reminded plaintiff of the policy provisions applicable to

12   the LWOP benefit, including the requirement that she remain continuously Totally Disabled,

13   and that she provide proof of continuation of Total Disability.  He added that "next year we

14   will likely require a medical records update because our auditors require our medical staff

15   to periodically update our files."  AR 787-788.

16        On February 22, 2012, a CGLIC Waiver Claim Specialist wrote to plaintiff requesting

17   that she complete a new Waiver of Premium Questionnaire.  As completed by plaintiff, the

18   form, dated June 6, 2012, contained minimal information.  She noted that her husband had

19   helped her complete the form.  AR 761.  In response to the question, "Tell us why you

20   cannot work in your own occupation," plaintiff answered, "Totally disabled."  In response to

21   the question, "Tell us why you cannot work in any occupation based on your education,

22   training, and work experience," plaintiff answered, "Cognitive impairment, severe

23   depression."  AR 760.

24        Plaintiff stated she was not working and was not interested in career options, and

25   that she could not use a computer and that she was "not computer literate."  AR 760.

26   She indicated she engaged in no activities other than "enjoy[ing] the beauty of the garden

27   and looking at home magazines."  AR 762.  She stated that they had a housekeeper and

28   gardener to do housework and yardwork, and that her husband "shops for groceries and

picks up meals." AR 762.

In response to the request for the names of "doctors" she sees "regularly," plaintiff provided only two names – Andrew Krompier, M.D., her psychiatrist (whom she said she saw "every other month"), and Noga Dreifuss, M.S. (whom she said she saw "monthly"). AR 762.

At plaintiff's direction, Dr. Robertson also provided a new certification form and extensive medical records. AR 768-772. However, while he stated on the form (dated May 24, 2012) that plaintiff was "permanently disabled," he also stated that he was "unable to comment regarding pt's mental impairments." AR 770. Recent office notes from Dr. Robertson indicated that he continued to treat plaintiff for hypertension and hyperlipidemia (high cholesterol). AR 719-721. Notes from the September 26, 2011 office visit state that "[t]he patient feels quite well." Her blood pressure was recorded at 140/84. AR 721. Both the hypertension and the hyperlipidemia were reported to be "improved." AR 722. The office notes for March 5, 2012 state that "[t]he patient feels OK (at least physically). AR 719. At her March 11, 2012, office visit, her hypertension was noted to be "improved" – 134/84. AR 720.

Starting in June 2012, CGLIC began attempting to obtain records and completed behavioral health questionnaires from Dr. Krompier and Ms. Dreifuss. AR 709-710; see also AR 684-686. On June 21, 2012, CGLIC requested that Dr. Krompier submit a completed Behavioral Health Questionnaire, plus "Office and Treatment notes, Therapy Notes, Consultation Reports, Operative Reports, Radiology Reports, Admission and Discharge Summaries, any test results and/or any labs" dated from January 2011 through the date of the request. CGLIC also requested "any objective test results even those outside the requested date range that will support your patient's condition and better help us understand their level of function." AR 709.

Also on June 21, 2012, CGLIC requested that Ms. Dreifuss submit a completed Behavioral Health Questionnaire, as well as copies of "medical records, consultation reports, operative reports, hospital admission and discharge summaries, test, x-rays, and

United States District Court

For the Northern District of California

1  lab results and therapy notes" from January 2001 to the date of the requests.  AR 710.

2  CGLIC made similar requests of Ms. Dreifuss on July 16, 2012, and August 9, 2012.  AR

3  686, 691.  CGLIC also left a voicemail message for Ms. Dreifuss on August 9, 2012, and

4  notified plaintiff of the repeated requests it had submitted to Ms. Dreifuss.  AR 684-685.

5          CGLIC representatives explained to plaintiff and her husband several times what

6  data CGLIC was requesting from her providers, and why.  See, e.g., 673-676-, 684, 764,

7  783, 786-788.  Nevertheless, despite the fact that plaintiff's claim was based entirely on

8  mental health conditions, Mr. Brown sent a series of emails starting in July 2012

9  expressing unhappiness that CGLIC wanted to obtain records and information from

10  plaintiff's mental health providers.  AR 692-698; see also AR 668-669, 672-676, 681.

11  CGLIC responded to Mr. Brown's questions, e.g. AR 697, but Mr. Brown continued to resist

12  CGLIC's efforts to obtain contemporaneous treatment records from Dr. Krompier and Ms.

13  Dreifuss.  AR 692-693.  In addition, the Disclosure Authorization plaintiff signed on June 6,

14  2012 was severely redlined to eliminate many categories of information and their sources.

15  AR 763.

16          Ultimately, Dr. Krompier faxed in a completed Behavioral Health Questionnaire on

17  August 3, 2012.  AR 688-690.  He noted "symptoms improved [from 2001 to 2012] but

18  continues low mood, anxiety, excessive worry, excessive guilt, hopelessness,

19  worthlessness still present, intense shame, cognitive deficits, easily overwhelmed."  AR

20  688.  He noted a PAQ9 score of 20, and HAMD score of 26, and diagnosed plaintiff with

21  Cognitive Disorder NOS [Not Otherwise Specified] (HTN) [hypertension], IDC-0

22  Code:294.9; and Major Depression, ICD-9 Code:296.20 (Single Episode, Severity

23  Unspecified).  AR 688.  Dr. Krompier concluded that plaintiff was permanently disabled

24  from all work, stating "Patient's HTN contributed to marked cognitive decline."  AR 690.  He

25  did not provide any office treatment notes.  AR 667.

26          Ms. Dreifuss finally telephoned CGLIC's claim representative on August 20, 2012,

27  and left a voicemail stating that she did not have an authorization to release any

28  information about plaintiff to CGLIC, and that both plaintiff and her husband had said they

1   didn't want her to release the information.  AR 680.

2        The records CGLIC was able to obtain were referred to Behavioral Health Specialist

3   John Martello, R.N. for review and analysis.  AR 666.  In his medical summary, he pointed

4   out the lack of office visit notes from either plaintiff's psychiatrist Dr. Krompier or her

5   therapist Ms. Dreifuss; the low treatment levels (monthly visits, at most, according to

6   plaintiff's questionnaire responses), consistent with low symptom intensity; and the lack of

7   evidence supporting the claimed cognitive deficits, such as current neuropsychological

8   testing or even full test scores from a Mini Mental Status Evaluation (MMSE).  AR 667.

9        On September 19, 2012, a CGLIC Waiver Claim Specialist wrote plaintiff a 6-page

10  letter advising that her premium waiver would no longer continue "based on the current

11  medical documentation on file."  AR 644-649.  The letter explained the relevant policy

12  provisions, and discussed in some detail the evidence CGLIC had obtained, noting

13  CGLIC's unsuccessful efforts to obtain more complete information to support plaintiff's

14  claim.  AR 645-647.  The letter concluded that based on the evidence submitted, plaintiff no

15  longer met the definition of disability in the applicable policy provision – "completely unable

16  to engage in any occupation for wage or profit because of injury or sickness" – and CGLIC

17  was closing plaintiff's LWOP benefit, effective as of the date of the letter.  AR 647.

18       On December 26, 2012, CGLIC received a letter from attorney Terrence Coleman,

19  announcing his law firm's representation of plaintiff and intent to appeal, and requesting a

20  copy of her file.  AR 635.  The file was sent on January 7, 2013, at which time CGLIC also

21  invited plaintiff (via her counsel) to submit any additional pertinent information by January

22  28, 2013.  AR 628.  CGLIC also stated that the complete file, including any additional

23  submitted information, would be considered during the appeal review process.  AR 628.  At

24  counsel's request, plaintiff was given an extension of time to appeal – to March 31, 2013.

25       On March 28, 2013, plaintiff submitted her appeal.  AR 552-609.  Along with the

26  appeal letter, plaintiff submitted a copy of the claim file (not separately reproduced in the

27  AR); a two-page letter to plaintiff's counsel from Dr. Krompier dated March 8, 2013,

28  supporting plaintiff's appeal and indicating that plaintiff's hypertension contributed to her

United States District Court

For the Northern District of California

cognitive decline, and that she had cognitive deficits that prevented her from performing "the listed work functions,"[1] AR 557-558; articles linking hypertension and vascular dementia in the elderly, AR 559-565; a 2008 letter from Dr. Krompier to a federal district court in Los Angeles offering the opinion that plaintiff could not reliably testify before a grand jury, AR 566; blank copies of the PHQ-9 and Hamilton Rating Scale for Depression (HAM-D), AR 567-571, which Dr. Krompier apparently had administered during plaintiff's August 3, 2012 visit (though no completed forms were attached); and a copy of a July 29, 2001 award letter from the Social Security Administration (SSA), AR 572-575.

In the appeal letter, plaintiff's counsel argued that CGLIC had improperly relied on a "paper review" by its in-house Nurse Behavioral Health Specialist, Mr. Martello, and asserted that this reliance on a reviewer who had never seen nor examined plaintiff and who is not a licensed psychologist or psychiatrist was "simply shocking." AR 553. Counsel also complained that Nurse Martello had ignored findings by Dr. Krompier, and had engaged in "cherry picking," which demonstrated his "lack of expertise and bias." AR 554-555. Counsel emphasized Dr. Krompier's conclusion that plaintiff is permanently disabled, and that her cognitive decline is likely due to her "uncontrollable" hypertension. AR 555.

The attached SSA award letter included a determination that plaintiff is totally disabled from any gainful occupation, and has been since October 2000; and counsel noted that the SSA continues to pay plaintiff disability payments to this day. AR 555.

Following receipt of the appeal letter and attached documents, CGLIC's Appeal Specialist confirmed with plaintiff's counsel that plaintiff intended to provide no further information or psychiatric or therapy records. Counsel also confirmed that he was not aware of any updated neurological workup or updated testing, such as an MRI or CT scan, to support Dr. Krompier's suggestion in his letter submitted with the appeal that plaintiff could be suffering from vascular dementia caused by hypertension. AR 551.

---

[1] As noted above, the definition of "Totally Disabled" requires a showing that plaintiff is "completely unable to engage in any occupation for wage or profit because of injury or sickness." AR 476. This is not the same as a showing that she is unable to perform particular job functions or the functions of a particular occupation.

United States District Court

For the Northern District of California

1    CGLIC referred the records to Peter Volpe, M.D., a licensed and Board-certified

2  psychiatrist, for review. AR 543-550.  Dr. Volpe's May 1, 2013 report (AR 547-549)

3  concluded that "the record does not support the presence of a functional mental impairment

4  that restricts Paula Brown from employment in any occupation."  AR 547.  In particular, Dr.

5  Volpe noted that while Dr. Krompier stated that plaintiff exhibited cognitive impairments

6  such that she is unable to work, he provided "no measured and objectively clinical

7  assessment of cognition" and in addition, Dr. Karzmark's psychological testing results did

8  not demonstrate that plaintiff had any cognitive impairments, which made Dr. Krompier's

9  statements of cognitive impairment not credible.

10    Dr. Volpe found that the medical record did not reflect the presence of a mental

11  impairment of a severity sufficient to necessitate restriction from work in any occupation;

12  and that the intensity of treatment provided by Dr. Krompier (i.e., treatment since 2001, but

13  no change in psychiatric medications since 2002) did not support the presence of

14  impairments sufficient to justify restriction from work in any occupation.  AR 548.  He noted

15  that the only neuropsychological test in the record – Dr. Karzmark's May 16, 2003

16  psychological testing report – strongly suggested that plaintiff was malingering and

17  exaggerating her impairment.  AR 548.

18    In addition, Dr. Volpe stated that the screening tools on which Dr. Krompier had

19  relied were not validated for the purpose of establishing depression or mental impairment.

20  He described the MMSE as merely "a screening tool used to identify whether further

21  testing should be conducted to assess for cognitive impairment," but not "a definitive

22  instrument to assess for cognitive impairment," especially in the case of plaintiff, as "it is not

23  objective and cannot be validated."  AR 548.  He also commented that the PHQ-9 and

24  HAM-D depression screening tools "are not definitive instruments for assessing the

25  presence of depression," again, because they "are not objective and cannot be validated."

26  AR 548.

27    As for the SSA Notice of Award, Dr. Volpe noted that the award was made in 2001,

28  and that he had none of the documentation utilized by the SSA to make its decision (but did

United States District Court

For the Northern District of California

1   have access to further clinical information beyond that date).  Moreover, he noted, the

2   standards and criteria applicable to an award of SSA disability benefits would be different

3   than those applicable to the assessment of Total Disability under the LWOP benefits.  AR

4   548-549.

5          On May 6, 2013, a CGLIC Appeals Specialist wrote counsel for plaintiff a detailed

6   letter, AR 540-545, explaining that the September 19, 2012 decision to discontinue the

7   waiver of premium benefits would be upheld.  Plaintiff was also advised of her right to seek

8   review of the decision or to bring a legal action under ERISA § 502(a).

9          Plaintiff filed the complaint in the present action on November 27, 2013, asserting a

10  single cause of action under 29 U.S.C. § 1132(a)(1)(B), seeking a determination that

11  plaintiff is entitled to reinstatement of the waiver of premium benefits, and an injunction

12  mandating an award of waiver of premium benefits to plaintiff for the maximum period

13  under the Plan; and also seeking reimbursement of premiums paid[2]; and attorney's fees

14  and costs.

15         On April 28, 2014, the parties stipulated that the applicable standard of review would

16  be de novo.  Each side now seeks judgment under Federal Rule of Civil Procedure 52, and

17  each side has submitted proposed findings of fact and conclusions of law.

**DISCUSSION**

18

19  A.    Legal Standard

20         Under ERISA § 502, a beneficiary or plan participant may sue in federal court "to

21  recover benefits due to him under the terms of his plan, to enforce his rights under the

22  terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29

23  U.S.C. § 1132(a)(1)(B); see also CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1871 (2011);

24  Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004).

25         A claim of denial of benefits in an ERISA case is to be reviewed "under a de novo

26  standard unless the benefit plan gives the administrator or fiduciary discretionary authority

27  ───────────────

28         [2]  In her motion, plaintiff asserts that the total amount of her out-of-pocket premium
payments for September 19, 2007, through October 29, 2014, is $17,750.96.

United States District Court

For the Northern District of California

to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Montour v. Hartford Life & Acc. Ins. Co.</u>, 588 F.3d 623, 629 (9th Cir. 2009).   De novo review means that the court "considers the matter anew, as if no decision had been rendered." <u>Dawson v. Marshall</u>, 561 F.3d 930, 932-33 (9th Cir.2009).  Here, the parties have agreed that review is de novo, and each side seeks judgment under Rule 52.

Rule 52(a) provides, in part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state the conclusions of law separately."  The findings "may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).  In ERISA cases, it is common for parties to bring cross-motions for summary judgment under Rule 52, in which case the court conducts a de novo review of the plan administrator's decision denying benefits, <u>see Lee v. Kaiser Found. Health Plan Long Term Disability Plan</u>, 2012 WL 664733 at *2 & n.4 (N.D. Cal. Feb. 28, 2012), which is to say that "the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." <u>Caplan v. CNA Fin. Corp.</u>, 544 F.Supp. 2d 984, 990 (N.D. Cal. 2008) (citing <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1094-95 (9th Cir. 1999)).

In a de novo review of a plan administrator's decision, "the burden of proof is placed on the clamant" to establish his/her entitlement to benefits. <u>Muniz v. Amec Constr. Mgmt. Inc.</u>, 623 F.3d 1290, 1294 (9th Cir. 2010); <u>see also Inciong v. Fort Dearborn Life Ins. Co.</u>, 570 Fed. Appx. 724, 725 (9th Cir. 2014).  When conducting de novo review of a decision by an ERISA plan administrator, the court must undertake an independent and thorough inspection of the decision.  <u>See Silver v. Executive Car Leasing Long-Term Disability Plan</u>, 466 F.3d 727, 733 (9th Cir. 2006).  The court then "proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits" based on the evidence in the administrative record. <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006) (en banc); <u>see also Firestone</u>, 489 U.S. at 115.

United States District Court
For the Northern District of California

1    "When faced with questions of insurance policy interpretation under ERISA, federal

2    courts should apply federal common law." Padfield v. AIG Life Ins. Co., 290 F.3d 1121,

3    1125 (9th Cir.2002) (citing Firestone, 489 U.S. at 110).  Under federal law, courts should

4    then interpret plan terms "in an ordinary and popular sense as would a [person] of average

5    intelligence and experience." Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir.

6    1985).

7    B.    The Cross-Motions

8          Plaintiff is not entitled to life waiver of premium (LWOP) benefits unless she submits

9    "due proof" of continuous Total Disability as defined in the Life Policy.  AR 475.  As

10   explained above, the Policy requires that plaintiff submit proof that she is "completely

11   unable to engage in any occupation for wage or profit because of illness or sickness."  AR

12   476.[3]  The Policy provides that once such proof is provided, the policy premium "will be

13   waived for a period of one year from the date that proof is received by [CGLIC].  AR 475.

14   The premiums are waived for further periods if the claimant "remains Totally Disabled," and

15   "submits to [CGLIC], during the three months before the end of such one-year period, proof

16   of the continuation of Total Disability."  AR 475.

17         Each party now seeks judgment in its favor.  Plaintiff seeks an order finding that her

18   claim of permanent disability was supported by objective evidence, including the opinions

19   and diagnoses of her three treating medical providers, and that the opinions of CGLIC's in-

20   house psychiatrist and nurse are unreliable and their review is "inherently suspect."  CGLIC

21

22         [3]  Plaintiff's argument that Life Policy definition of "Total Disability" does not apply, and
23   that the correct definition is "unable to perform with reasonable continuity in the usual and
     customary manner the material and substantial duties of her own occupation," as set forth in
24   Erreca v. Western States Life Ins. Co., 19 Cal. 2d 388, 394-95 (1942), is without merit.  The
     Erreca definition might be relevant if this were a diversity case, e.g., Hangarter v. Provident
25   Life & Accident Ins. Co., 373 F.3d 998, 1006 (9th Cir. 2004).  However, district courts in this
     Circuit – including this court – have repeatedly held that the Erreca definition is not binding in
26   ERISA cases. See, e.g., Ramos v. United Omaha Life Ins. Co., No. 12-3761 PJH, 2013 WL
     60985 (N.D. Cal. Jan. 3, 2013). see also Smith v. Hartford Life & Acc., 2013 WL 394185 at *18
27   (N.D. Cal. Jan. 30, 2013); Brady v. United Omaha Life Ins. Co., 2012 WL 3583033 at *5-7
     (N.D. Cal. Aug. 20, 2012); Finkelstein v. Guardian Life Ins. Co. of America, 2008 WL 8634992
28   at *8 (N.D. Cal. Nov. 23, 2008); Leick v. Hartford Life & Acc. Ins. Co., 2008 WL 1882850 at *5
     (E.D. Cal. Apr. 24, 2008).

United States District Court

For the Northern District of California

seeks an order finding that its termination of plaintiff's LWOP benefits was proper because plaintiff failed to establish that she was Totally Disabled within the meaning of the Life Policy definition.  Because each side makes similar arguments in support of its own motion and in opposition to the other side's motion, the court has combined them in the following discussion.

      1.    Plaintiff's arguments

Plaintiff argues that the court should enter judgment in her favor because she has established by a preponderance of the evidence that she is permanently disabled from "any occupation."  First, she contends that her claim of "permanent disability" is supported by all three of her treating providers – her internist, Dr. Robertson, who diagnosed her with hypertension and stated in February 2008, March 2009, March 2010, May 2011, and May 2012 that she had suffered a severe deficit in cognitive and affective functioning, and that in his opinion she is "permanently disabled;" her therapist, Noga Dreifuss, MFT, who stated in September 2004, November 2004, March 2005, November 2005, and November 2006 that plaintiff had "severely incapacitating" mood disturbances, anxiety, and "Thinking/ Cognition/Memory/Concentration Problems" which made her permanently disabled from her job; and her psychiatrist, Dr. Krompier, who stated in August 2012 that plaintiff's hypertension "contributed to marked cognitive decline, preventing high work performance and [that she] now cannot function in any sphere of work," and that he "does not feel she will ever be able to [return to work];" and stated in March 2013 that plaintiff had "uncontrollable [hypertension] for a number of years that created cognitive deficits [which] led to an inability to perform her high level job and severe depression," and that she was "permanently disabled from all employment."

Plaintiff asserts further that "objective evidence" establishes that she is permanently Totally Disabled.  In particular, she points to the August 3, 2012 Behavioral Health Questionnaire from Dr. Krompier – which indicated that she suffered from severe cognitive impairment, and referenced the scores on several psychological tests, including a GAF score of 45/48, a PHQ score of 20, and a HAM-D score of 26, and results of memory tests.

1   AR 688.  She asserts that this is sufficient to support her claim.  She also points to her own

2   statement of disability dated June 6, 2012; and the SSDI benefit letter dated June 29,

3   2001.  She claims that these documents also show that her chronic and debilitating mental

4   illness, which has persisted for more than ten years, continued through September 19,

5   2012.

6        Plaintiff argues that the "paper reviews" of CGLIC's in-house nurse (Martello) and its

7   psychiatrist (Dr. Volpe) should be discounted.  She contends that the fact that the reviews

8   were performed without an in-person examination raises questions about the thoroughness

9   and accuracy of CGLIC's benefits determination, especially considering that all three of her

10  treating providers – Dr. Robertson, Dr. Krompier, and Ms. Dreifuss – have certified her

11  continuing disability.

12       Plaintiff contends that a claims administrator's failure to do an in-person examination

13  is particularly significant when a claimant has psychological limitations as in this case, and

14  argues, essentially, that the only valid method of formulating an opinion regarding a

15  claimant's mental condition is through personal interaction by the medical provider with the

16  claimant.  In support, she relies on Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623,

17  634 (9th Cir. 2009); and Smith v. Hartford Life & Acc., 2013 WL 394185 at *23-24 (N.D.

18  Cal. Jan. 30, 2013).

19       She also asserts that the opinions of CGLIC's in-house psychiatrist (Dr. Volpe) are

20  unreliable for the further reason that they are based on unsubstantiated neuro-

21  psychological testing that is more than a decade old (referring to Dr. Karzmark's May 16,

22  2003 psychological testing report, and to Dr. Greicius' May 2, 2003 report), which Dr. Volpe

23  used to support his determination that Dr. Krompier's 2012 and 2013 statements of

24  cognitive impairment were not credible.

25       Plaintiff also argues that CGLIC's denial of this claim contradicts its prior conduct.

26  Specifically, she notes that in 2007, CGLIC approved plaintiff's LWOP benefits, and

27  concluded (based on records from Ms. Dreifuss and Dr. Robertson) that there are "clearly

28  functional impairments" that preclude plaintiff from working, and that she is "reasonably

United States District Court

For the Northern District of California

1  unable to sustain working in any capacity at this time[;]"  AR 435, and that CGLIC continued

2  to pay the LWOP benefit for the next five years, based only on submission of an APS from

3  Dr. Robertson, which certified her continuing disability. AR 791, 804, 815, 823, 1290.  Now,

4  she asserts, even though nothing regarding her condition has changed, CGLIC has

5  improperly taken the position that she is no longer entitled to benefits.  In addition, she

6  contends, while CGLIC had the 2003 neuropsychological report from Dr. Karzmark during

7  that entire time, it is only now attempting to rely on that report to claim that plaintiff is no

8  longer disabled and no longer entitled to LWOP benefits.

9      Finally, plaintiff contends that CGLIC never explained what evidence is required to

10  perfect her claim.  Plaintiff asserts that because she was uncertain exactly what tests

11  CGLIC wanted to see, she asked in a May 10, 2013 letter (following her receipt of the letter

12  denying her appeal) exactly what tests were required (AR 533).  In response, CGLIC stated

13  as follows:

> In addressing your question, instances where total disability is reported to be
> caused by cognitive impairment, such as dementia, it would be expected that
> psychological testing conducted by a psychologist experienced in
> administering objective and validated psychological and neuropsychological
> instruments would support those assertions.  Clinician records are frequently
> utilized to provide supporting documentation of severe psychological illness.

AR 530.  Based on this, plaintiff contends that CGLIC failed to comply with its obligation,

set forth in the ERISA regulations, to explain what "additional material or information [was]

necessary for the claimant to perfect the claim and an explanation of why such material or

information is necessary."  29 C.F.R. § 2560.503-1(g)(iii).  In so doing, plaintiff asserts,

CGLIC violated its duty to engage in a "meaningful dialogue" with her in deciding whether

to grant or deny benefits (citing Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522

F.3d 863, 873 (9th Cir. 2008)).

Plaintiff claims that CGLIC could easily have spoken with Dr. Krompier and Ms.

Dreifuss to obtain a "summary" of her treatment records and treatment plan in lieu of the

actual records, and also could have given plaintiff the opportunity to obtain updated

neuropsychological testing – but it did none of these things, and instead denied the claim

17

United States District Court

For the Northern District of California

1    based on lack of supported psychiatric restrictions or limitations, and also claiming that her

2    symptoms were not sufficiently severe.

3          2.      Defendant's arguments

4          CGLIC argues that the court should enter judgment in its favor because plaintiff

5    failed to prove during the administration of her claim that she remained unable to engage in

6    any occupation for wage or profit after September 19, 2012.  Plaintiff's claim, when filed,

7    was based on depression and cognitive impairment only.  CGLIC notes that while plaintiff

8    suggested in the appeal that her cognitive impairment was caused by hypertension, and

9    while Dr. Robertson's most recent Statement of Disability (March 5, 2012) diagnosed

10   plaintiff with severe hypertension, her blood pressure reading that day was only 134/84,

11   and her hypertension was noted as "improved."  Moreover, CGLIC asserts, the section of

12   the form for "physical function limitations" was crossed out as "N/A," and Dr. Robertson

13   specifically stated he could not comment on plaintiff's mental impairment.  AR 770.

14         In addition, CGLIC argues, plaintiff herself did not claim any physical limitations on

15   her ability to work.  Thus, it was left to plaintiff's mental health providers (Ms. Dreifuss and

16   Dr. Krompier) to support her claimed inability to engage in any occupation for wage or profit

17   as a result of her alleged mood or cognitive impairments.  However, CGLIC had no records

18   from Ms. Dreifuss beyond January 23, 2007.  AR 710.  In 2012, when the claim was being

19   evaluated, plaintiff refused to allow Ms. Dreifuss to provide any updated records.  AR 680.

20   All plaintiff disclosed about her treatment by Ms. Dreifuss was that it occurred about once a

21   month.  AR 762.

22         Similarly, CGLIC asserts, the only information received in recent years (prior to the

23   September 19, 2012 initial denial letter) from Dr. Krompier consisted of a three-page form

24   that he completed on August 3, 2012, in which he diagnosed plaintiff with Cognitive

25   Disorder NOS and Major Depression.  AR 688.  CGLIC contends that the form made

26   reference to brief screening tests largely based on plaintiff's self-report, but did not disclose

27   any formal neuropsychological testing to establish cognitive impairment or a functionally

28   disabling mood disorder.  AR 688.

United States District Court

For the Northern District of California

1    Moreover, CGLIC asserts, despite plaintiff's claimed cognitive impairment, no

2  neuropsychological assessment reports appear in the file for any period later than May 16,

3  2003, more than nine years before the LWOP benefit was terminated.  It was on that date

4  that Dr. Karzmark conducted a neuropsychological assessment in which he found that

5  plaintiff's exaggeration of her cognitive symptoms was so "strongly suggested" that the

6  assessment test results did not provide a valid picture of her cognitive functioning.  AR 893-

7  894.

8    Finally, CGLIC argues, even if any of the above had been sufficient to establish

9  some level of depression or cognitive impairment as of the time the claim was being

10 evaluated, nothing provided by plaintiff established how or to what extent these conditions

11 would interfere with her ability to engage in some sort of gainful occupation, even part-time.

12 CGLIC contends that it is an individual's ability to function, not his or her diagnosis, that

13 entitles him/her to disability benefits.

14    Moving to the appeal, CGLIC asserts that plaintiff offered little additional material to

15 support her claim.  As for the March 8, 2013 letter from Dr. Krompier, in which he asserted

16 that the conclusions of CGLIC's in-house nurse reviewer were wrong, and that he (Dr.

17 Krompier) had regularly observed plaintiff for years, AR 557-558, CGLIC contends that the

18 theory espoused in that letter by Dr. Krompier – that there is a connection between

19 hypertension and dementia – and the scientific articles he attached to his letter were all

20 entirely speculative as applied to plaintiff.

21    Indeed, CGLIC notes, the records in plaintiff's file include no mention of dementia,

22 and plaintiff herself was never diagnosed with dementia, even though it is a recognized

23 diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed. (DSM-

24 IV-TR), the standard diagnostic manual used in the mental health professions.  Nor, CGLIC

25 argues, is hypertension listed in the DSM-IV as one of the suggested causes of "Dementia

26 Due to Other General Medical Conditions" suggested in the Manual.

27    3.    Analysis and findings

28    On de novo review, the court finds that plaintiff's motion must be DENIED, and

19

1  CGLIC's motion must be GRANTED.  Plaintiff's claim of Total Disability is based solely on

2  her claims of depression and cognitive impairment.  AR 760.  She claims no physical

3  limitations, AR 760, 770, or at least not on her ability to work.  The terms of the Life Policy

4  require plaintiff to provide proof of continuing disability, and do not require CGLIC to

5  assume that burden.  The Life Policy states that

6       at any time while [an Insured's] cost of life insurance is being waived, CG will
     have the right to require proof of his continuing Total Disability and, at its own
7       expense, to have a Physician of its choice examine him.  However, after he
     has been Totally Disabled for two years, CG will require proof no more than
8       once a year.

9  AR 476.  Plaintiff has failed to sustain her burden of proving continuing Total Disability for

10  the period in question.

11       Plaintiff failed to satisfy her burden of proving that she continued to be disabled after

12  September 19, 2012.  CGLIC received copious notes from Dr. Robertson, including a May

13  24, 2012 APS stating that plaintiff was "permanently disabled."  AR 770.  However, he

14  indicated that plaintiff's hypertension was improved, and that she had no physical

15  limitations.  Dr. Robertson is not a psychiatrist or mental health provider.  Indeed, he stated

16  that he was "unable to comment on [plaintiff's] mental impairment."  AR 770.

17       The last mental health records CGLIC received were from January 2007, and were

18  provided by Ms. Dreifuss, and the only fact plaintiff provided in 2012 about her treatment

19  with Ms. Dreifuss was that it took place once a month.  CGLIC never received any

20  contemporaneous office notes from Dr. Krompier – just the three-page questionnaire dated

21  August 3, 2012, noting the results of brief screening tests he had administered that day,

22  and reflecting that plaintiff's medication protocol had not changed in over ten years.  AR

23  688-690.

24       While Dr. Krompier diagnosed plaintiff with Cognitive Disorder NOS [Not Otherwise

25  Specified] (HTN), 294.9; and Major Depression, 296.20 [688], those diagnoses, even were

26  they adequately established and supported, did not by their mere existence establish either

27  the degree of plaintiff's impairment or its likely duration.  A conclusory statement, such as

28  the statement in Dr. Krompier's August 3, 2012 submission that plaintiff had a "permanent,

United States District Court

For the Northern District of California

1    total work disability," is insufficient to establish ongoing treatment for the relevant period

2    without supporting contemporaneous documentation.

3         Nor did the remaining information plaintiff provided satisfy her burden of proving

4    ongoing disability.  This included a June 6, 2012 statement by plaintiff herself that her

5    claimed inability to work was based on "Cognitive impairment, severe depression," AR 760,

6    and that she was being treated once a month by Ms. Dreifuss and once every two months

7    by Dr. Krompier, AR 762.  However, there was nothing from Ms. Dreifuss after January

8    2007; and no neuropsychological testing since May 16, 2003, when plaintiff's symptom

9    exaggeration invalidated the results, see AR 893-894;

10        Plaintiff contends that a claims administrator is not permitted to rely on an in-house

11   medical evaluator's review of the records submitted by a claimant in order to determine

12   whether the claimant is entitled to benefits, and that in this case, CGLIC was obligated to

13   arrange for an independent in-person medical examination of her if it felt that the records

14   from her treating doctors/therapists were inadequate to support her claim.  While that may

15   be a factor to consider where the court is considering whether the administrator abused its

16   discretion in denying a claim – as in Montoure and Smith, the cases cited by plaintiff – a

17   court conducting a de novo review simply looks at the administrator's decision and the

18   evidence or record on which it was based.  Abatie, 458 F.3d at 963; see also Firestone,

19   489 U.S. at 115.

20        Moreover, when the court reviews a plan administrator's decision de novo, the

21   burden of proof remains with the claimant to establish that he/she is entitled to benefits,

22   and does not shift back to the administrator once the claimant has advanced some

23   evidence to support his/her claim, see Muniz, 623 F.3d at 1294-95, as plaintiff suggests in

24   arguing that CGLIC was obligated to arrange for an in-person medical examination rather

25   than relying on the analysis of the file by its in-house nurse reviewer and in-house

26   psychiatrist.  Nor did the burden of proof shift to CGLIC by virtue of its previous approval of

27   the claim for benefits under the LTD policy (issued by LINA) or its prior approval of the

28   LWOP benefit.  See id. at 1296; see also Inciong, 570 Fed. Appx. at 725-26.  The

United States District Court
For the Northern District of California

1   adequacy of CGLIC's handling of the LWOP claim – including its reliance on a "paper

2   review" – is irrelevant on de novo review, see Incong, 570 Fed. Appx. at 726-27, as the

3   only question before the court is whether plaintiff established that she was entitled to

4   continuance of her LWOP benefit beyond September 19, 2012.

5          The record shows that plaintiff was advised in May 2011 that a more comprehensive

6   medical review would likely be required in 2012 for the three-month period preceding the

7   anniversary of her benefits start date – the period February 21 to May 21, 2012.  AR 787-

8   788.  The record also shows, contrary to plaintiff's assertion that CGLIC failed to inform her

9   as to what she needed to submit in order to perfect her claim, that CGLIC did tell her

10  exactly what it required on several occasions, including in a July 12, 2012 email to her

11  husband:

12          We ask for the following:  Office and Treatment notes, Therapy Notes,
            Consultation Reports (including Neuropsychiatric Evaluations), Operative
13          Reports, Radiology Reports, Admission and Discharge Summaries, any test
            results and/or any labs.
14
            Although our authorization does not specifically release psychotherapy notes,
15          most patients sign an authorization at their doctor's office that allows the
            facility to release the information.  If the doctor/facility will not release the
16          specific psychotherapy notes due to the authorizations on file, most will
            provide us with a summary of the patient's treatment records and treatment
17          plan in lieu of the actual psychotherapy notations.

18  AR 692.

19         Further, in its September 19, 2012 initial denial letter, after pointing out that there

20  was no evidence to support plaintiff's reports of a cognitive deficit, CGLIC provided a list of

21  examples of information that plaintiff could submit with her appeal to help support her

22  claimed loss of functionality.  AR 647.  Plaintiff's contention that CGLIC violated its

23  obligation to "engage in a meaningful dialogue" with her by failing to explain what additional

24  material was required to support her claim is plainly not supported by the record; and

25  Saffon, the case cited by plaintiff in support of this argument, involved the application of the

26  abuse-of-discretion standard, not de novo review.

27         On July 12, 2012, CGLIC advised plaintiff that because she was claiming disability

28  based on mental health status, it was appropriate to review records concerning mental

1   health; and that even where a patient will not authorize release of the actual psychotherapy

2   notes, most will authorize the doctor to provide a summary of the patient's treatment

3   records and treatment plan in lieu of the notes.  AR 656.  CGLIC added that if it did not

4   receive the requested information, it would proceed with the records it did have.  AR 656.

5          Nevertheless, at plaintiff's direction, no office notes or treatment records from her

6   mental health providers were ever produced in 2012 or 2013.  It was in part because of this

7   lack of records that CGLIC's nurse reviewer concluded that there was no demonstrated

8   functional impairment.  Even on appeal, plaintiff provided little more – a March 8, 2013

9   letter from Dr. Krompier with articles linking hypertension and dementia; a seemingly

10  irrelevant 2008 letter from Dr. Krompier seeking to have plaintiff relieved from having to

11  testify before a grand jury; blank copies of two screening tools that Dr. Krompier had

12  apparently administered to plaintiff during her August 2012 visit; and a copy of the SSA's

13  2001 award letter to plaintiff, without any updates.

14         Based almost entirely on Dr. Krompier's conclusory assertion that plaintiff is "Totally

15  Disabled," plaintiff asserts she has provided sufficient proof of ongoing disability.  The court

16  finds, however, in line with Dr. Volpe's analysis of the record, that plaintiff has failed to

17  establish that she satisfied the Life Policy's definition of "Totally Disabled" for the period

18  2012-2013.  Both plaintiff and her providers were well aware of what was needed to assess

19  and document cognitive impairment, and clearly it was more than the brief screening tests

20  Dr. Krompier administered.  As for plaintiff's new suggestion (via Dr. Krompier) that it was

21  her hypertension that had led to the alleged cognitive impairment (briefly referenced as

22  "dementia"), there is nothing in the record to support a diagnosis of vascular dementia.

23         It does appear from the record that plaintiff was having severe symptoms of

24  depression when she stopped working in 2001.  In 2006 and 2007, she was seeing her

25  therapist, Ms. Dreifuss, on average once a week or, at most, every two weeks.  AR 910-

26  925.  However, by July 2012, when she completed a new Waiver of Premium

27  Questionnaire, she was seeing her Ms. Dreifuss only once a month and her psychiatrist,

28  Dr. Krompier, only once every two months.  AR 762.  Further, Dr. Krompier affirmed in his

United States District Court

For the Northern District of California

1  August 3, 2012 Behavioral Health Questionnaire that plaintiff's psychiatric medications had

2  not been changed in 10 years.  AR 689.

3       As for plaintiff's claimed cognitive impairment, she had a normal MRI and

4  neurological examination in 2003, AR 67; a neuropsychological examination in 2003 that

5  was invalidated for strongly suspected malingering, AR 892; and nothing since 2003 that

6  supported her inability to function in any work environment as a result of cognitive

7  difficulties;  While there were deficits revealed in the 2001 neuropsychological examination

8  (Dr. Novakovic-Agopian), conducted while plaintiff was experiencing severe depressive

9  symptoms, there is no clear evidence that those symptoms continued for the next dozen

10  years.  For similar reasons, the 2001 SSA award of SSDI benefits, AR 572, does not add to

11  the weight of the evidence that plaintiff was unable to work in any occupation in 2012.

12       The relevant period at issue with regard to plaintiff's claim for reinstatement of

13  LWOP benefits is 2012-2013.  In support of her claim, plaintiff primarily relies on her own

14  self-reported symptoms, and on the opinions of three providers.  Of those, Dr. Robertson is

15  an internist, not a mental health provider, and stated in May 2012 that he was "unable to

16  comment regarding pt's mental impairments."  Dr. Krompier provided no treatment or office

17  visit notes, and provided only conclusions that plaintiff was permanently disabled from all

18  employment, but without any supporting psychological or neuropsychological tests results.

19  And plaintiff refused to authorize Ms. Dreifuss to release any office visit or treatment notes

20  for the 2012-2013 period.

**CONCLUSION**

22       In accordance with the foregoing, defendant's motion for Rule 52 judgment is

23  GRANTED, and plaintiff's motion is DENIED.

25  **IT IS SO ORDERED.**

26  Dated:  December 17, 2014

                                          _____

27                                       PHYLLIS J. HAMILTON
                                     United States District Judge